Steven C. Bailey (SBN 146382)
[Designated Counsel for Service]
Martha E. Romero (SBN 128144)
**BAILEY & ROMERO**
2535 Kettner Blvd., Suite 2A1
San Diego, CA 92101
(619) 323-1389
steven@baileyandromerolaw.com

Attorneys for Plaintiffs
Cindy and Timothy Abshire,
Alan and Monica Butts,
Nomadness Corporation, and the
Mammoth Lakes Business Coalition

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT CALIFORNIA

| | |
|---|---|
| CINDY ABSHIRE; TIMOTHY ABSHIRE; ALAN BUTTS; MONICA BUTTS; NOMADNESS CORPORATION, a California corporation; and THE MAMMOTH LAKES BUSINESS COALITION, an unincorporated membership association;<br><br>    *plaintiffs*,<br><br>v.<br><br>GAVIN NEWSOM, in his capacity as Governor of the State of California; XAVIER BACCERA, in his capacity as California Attorney General; MARK GHALY, in his capacity as the Health and Human Services Director for the State of California;  TOMAS ARAGON, in his capacities as Director of the California State Department of Health and as State Public Health Officer for the State of California; JENNIFER KREITZ, | Case No**.**<br><br>**COMPLAINT**<br><br>**SUBSTANTIVE DUE PROCESS (14th Amendment)**<br><br>**PROCEDURAL DUE PROCESS (14th Amendment)**<br><br>**EQUAL PROTECTION (14th Amendment)**<br><br>**UNCOMPENSATED TAKINGS (5th Amendment)**<br><br>**COMMERCE CLAUSE (Art. 1, Section 8)**<br><br>**JURY TRIAL DEMANDED** |

in her capacity as the Chair of the Board of Supervisors of Mono County, California; RHONDA DUGGAN in her capacity as a Member of the Board of Supervisors of Mono County, California; BOB GARDNER in his capacity as a Member of the Board of Supervisors of Mono County, California; JOHN PETERS, in his capacity as a Member of the Board of Supervisors of Mono County, California; STACY CORLESS, in her capacity as a Member of the Board of Supervisors of Mono County, California; THOMAS BOO, in his capacities as Public Health officer for Mono County and the Town of Mammoth Lakes, California; ROB PATTERSON, in his capacity as a Finance Director of the Town of Mammoth Lakes, California; BEN MANNING in his capacity as a Revenue Specialist of the Town of Mammoth Lakes, California; KIM GETCHELL in her capacity as a Revenue Specialist of the Town of Mammoth Lakes, California; JENNA DUNCAN in her capacity as a Revenue Specialist of the Town of Mammoth Lakes, California; DANIEL HOLLER in his capacity as Town Manager of the Town of Mammoth Lakes; BILL SAUSER in his capacity as a Mayor of the Town of Mammoth Lakes, California; LYNDA SALCIDO in her capacity as a Mayor Pro Tem of the Town of Mammoth Lakes, California; JOHN WENTWORTH in his capacity as a Member of the Town Council of the Town of Mammoth Lakes, California; KIRK STAPP in his capacity as a Member of the Town Council of the Town of Mammoth Lakes, California; SARAH REA in her capacity as a Member of the Town Council of the town of

Mammoth Lakes, California; and
DOES 1-10 inclusive,

*defendants.*

1.      Plaintiffs, through undersigned counsel, pursuant to Rule 8 of the Federal Rules of Civil Procedure, submit the following as a Complaint in this matter.

**JURISDICTION AND VENUE**

2.      This action asserts claims pursuant to 42 U.S.C. § 1983. The court has jurisdiction over this civil action pursuant to 28 U.S.C. §§ 1331 and 1337. Declaratory relief is authorized on the facts alleged pursuant to 28 U.S.C. § 2201. Injunctive relief is authorized pursuant to 28 U.S.C. § 1343(a).

3.      Venue of this civil action in the Judicial District for the Eastern District of California is proper pursuant to 28 U.S.C. § 1391 (b) (1) and (2). Defendants maintain offices, exercise their authority in their official capacities, and have taken the actions at issue in this matter in the Judicial District for the Eastern District of California.

**NATURE OF THE ACTION**

4.      Plaintiffs bring this action to seek relief from ongoing arbitrary restrictions imposed and enforced by defendants which violate the fundamental liberties of plaintiffs and the citizens of the State of California and the United States and threaten them with irreparable harm.

5.      In California, a typical cold and flu season generally runs from October through March, although the associated seasonal viruses are detected year-round in the United States. The exact timing and duration of flu seasons can vary, but influenza activity often begins to increase in October.  Most of the time flu activity peaks between December and February, and

drops to minimal levels in the early Spring.[1]  Pneumonia is often caused by the viruses associated with influenza and a cold.[2]

6.      Near the end of 2019 during its cold and flu season, doctors in China were observing cases of pneumonia of unknown cause in Wuhan City, Hubei Province.  In early January 2020, a novel coronavirus was isolated and, through testing conducted on suspected cases, was identified as the cause of the pneumonia.  The novel coronavirus has been given the designation of SARS-Cov-2 (severe acute respiratory syndrome coronavirus 2).  Initial Chinese government reports were that there was no clear evidence of the virus easily passing from person to person.

7.      The Chinese government soon found the virus was spreading and implemented a series of large-scale interventions to control the epidemic. Beginning in March 2020, in response to the spread of the novel coronavirus and  COVID-19, Defendant Gavin Newsom, in his official capacity as Governor of the State of California, imposed emergency Orders pursuant to the authority granted him by California law.  The emergency Orders issued by Defendant Newsom and the restrictions implemented pursuant to such Orders are unprecedented in their scope and duration.  Plaintiffs have, in addition, been subjected to Orders and enforcement measures implemented under color of state law by Mono County, California and by the Town of Mammoth Lakes.

8.      The Orders and restrictions implemented and enforced by defendants in response to COVID-19 have imposed widespread partial population lockdowns, broadly-based and open-ended business closures and restrictions, and pervasive and ongoing restrictions on the right of the people to travel, associate, and assemble to pursue otherwise lawful spiritual, political, economic and social ends. These restrictions are unprecedented in the history of public health measures.

9.      While arguably justified in their inception as temporary measures imposed in the face of limited information, evidence and analysis available since at least May 2020

---

[1] https://www.cdc.gov/flu/symptoms/flu-vs-covid19.htm
[2] https://www.cdc.gov/pneumonia/causes.html

establish that the Orders and restrictions at issue in this matter cannot be justified as narrowly tailored to protect public health and have, in fact, resulted in other significant, negative health outcomes, including lower childhood vaccination rates, worsening cardiovascular disease outcomes, fewer cancer screenings and deteriorating mental health, leading to greater excess mortality in years to come. Given the failure of defendants to evaluate and weigh against the positive effects of the Order and restrictions at issue the significant, the long term negative health and economic consequences of such orders and restrictions, continued enforcement of the Orders and restrictions at issue in this matter would be arbitrary and capricious and would violate the fundamental rights of plaintiffs and the people of the State of California under the Fourteenth Amendment to travel, associate, pursue lawful professions, engage in lawful business enterprises, and seek gainful employment.

10.     The Orders and restrictions at issue in this matter were implemented solely through executive action and without affording plaintiffs and the people of State of California notice and an opportunity to be heard in violation of their right to procedural due process under the Fourteenth Amendment to the United States Constitution.

11.     The Orders and restrictions at issue in this matter are based on arbitrary and irrational classifications in violation of the right to equal protection guaranteed by the Fourteenth Amendment. The Orders and restrictions are based on arbitrary classifications of activities as "essential or "non-essential" that are not rationally related to promoting public health, promote the interests of favored groups without reference to the impact of the activities in question on the transmission of COVID-19, and shift the burden of the response to COVID-19 to a limited class of persons and businesses.

12.     The Orders and restrictions at issue in this matter have interfered with distinct investment-based expectations in private property without compensation and have thereby effected uncompensated takings in violation of the Fifth Amendment to the United States Constitution.

13.     The Orders and restrictions at issue in this matter unreasonably burden interstate commerce in violation of Article I, Section 8, Clause 3 of the Constitution.

14.     Plaintiffs have been seriously harmed by the Orders and restrictions at issue in this matter and are threatened with irreparable harm if the Orders and restrictions at issue are not enjoined.

15.     Plaintiffs are businesses located in the Town of Mammoth Lakes within Mono County serving the general public.  Plaintiff Mammoth Lakes Business Coalition (the "Coalition") is a membership association of dining and lodging establishments in the Town of Mammoth Lakes, and in Mono County, California.

16.     Plaintiffs have been damaged by the arbitrary and ever-changing Orders and restrictions at issue. The Orders at issue in this matter initially prohibited plaintiffs from providing lodging. This restriction threatened to bankrupt plaintiffs. The restriction on lodging was then lifted, but was soon reimposed, once again threatening plaintiffs' ability to stay in business and depriving plaintiffs of the benefit of their investment in measures implemented to prevent the spread of COVID-19 upon reopening.  Although plaintiffs' businesses are now able to operate on a limited basis, they are limited to providing lodging at a substantially reduced capacity and are losing lodging business to nearby communities and are suffering from community officials who under color of law are willing to dedicate limited resources to investigate every possible instance of an operator providing lodging to winter sports enthusiasts wanting to engage in health-essential outdoor activities available in the Mammoth community.  In additional, property owners are being prohibited from advertising that their properties may be or are available for future rental notwithstanding the future impact of Covid-19. Moreover, under the legal authority under which they purport to act, defendants are able to reinstate any previously imposed Orders and restrictions if preliminary and permanent injunctive relief is not granted.

17.     Plaintiffs have also been subjected to arbitrary, irrational, and discriminatory enforcement by the Town of Mammoth Lakes and Mono County, California in violation of their right to equal protection under the Fourteenth Amendment. the Town of Mammoth Lakes and Mono County intentionally, irrationally and arbitrarily issued closure and reduced capacity

orders and regulations as to certain plaintiffs while overlooking violations by similarly situated businesses.

18.     Defendants' violations of plaintiffs' fundamental rights have inflicted substantial financial losses upon plaintiffs, unreasonably infringed upon plaintiffs' liberty interests, resulted in uncompensated takings, and will result in irreparable harm to plaintiffs if enforcement of the Orders and restrictions at issue in this matter is not enjoined.

## PARTIES

19.     Plaintiff Cindy Abshire who is and was at all relevant times engaged in owning property for personal use and for providing short term lodging to customers in the Town of Mammoth Lakes, Mono County, California.

20.     Plaintiff Timothy Abshire who is and was at all relevant times engaged in owning property for personal use and for providing short term lodging to customers in the Town of Mammoth Lakes, Mono County, California.

21.     Plaintiff Alan Butts who is and was at all relevant times engaged in beneficially owning property for personal use and for and providing short term lodging to customers in the Town of Mammoth Lakes, Mono County, California.

22.     Plaintiff Monica Butts who is and was at all relevant times engaged in beneficially owning property for personal use and for and providing short term lodging to customers in the Town of Mammoth Lakes, Mono County, California.

23.     Plaintiff Nomadness Corporation ("Nomadness") is a California corporation which is and was at all relevant times engaged in managing, operating, and providing lodging services to customers, under contract with property owners, from a office location in Mammoth Lakes, Mono County, California.

24.     Plaintiff Mammoth Lakes Business Coalition (the "Coalition") is a membership association of businesses providing dining and lodging establishments in the Town of Mammoth Lakes and Mono County, California.  The Coalition is named as a representative of the interests of its members.  Some members of the Coalition have received citations or been

1    subject to other enforcement actions or threats thereof, and all are subject to enforcement of

2    the defendants' orders and regulations.

3          25.     Defendant Gavin Newsom is the Governor of the State of California. The

4    California Constitution vests the "supreme executive power of the State" in the Governor, who

5    "shall see that the law is faithfully executed." Cal. Const. Art. V, § 1. Governor Newsom is

6    named in his official capacity.

7          26.     Defendant Xavier Becerra is the Attorney General of California. Attorney

8    General Becerra is named in his official capacity.

9          27.     Defendant Mark Ghaly is the Health and Human Services Director for the State

10   of California. The Director of the California Health and Human Services Department is

11   responsible for overall management and control of the Health and Human Services

12   Department. Cal. Govt. Code § 12800 (b). Defendant Ghaly is named in his official capacity.

13         28.     Defendant Tomas Aragon is Director of the California State Department of

14   Public Health, and is the State Public Health Officer for the State of California. The State

15   Department of Public Health is a subdivision of the California Department of Health and

16   Human Services. The California State Department of Public Health is responsible for the

17   enforcement of California health and safety laws and regulations.  Defendant Aragon is named

18   in his official capacities.

19         29.     The term "State Defendants" as used hereinafter shall refer collectively to

20   defendants Gavin Newsom, Xavier Bacerra, Mark Ghaly and Tomas Aragon.

21         30.     Defendants Jennifer Kreitz, Rhonda Duggan, Bob Gardner, John Peters and

22   Stacy Corless are members of the Board of Supervisors for Mono County, California ("Board

23   of Supervisors"). The Board of Supervisors is the legislative and executive authority for

24   county government for Mono County, California ("Mono County").  As such, the Board of

25   Supervisors is the highest policy-making authority for Nevada County. Defendants Jennifer

26   Kreitz, Rhonda Duggan, Bob Gardner, John Peters and Stacy Corless are named in their

27   official capacities.

28

31.     The term "Supervisor Defendants" as used hereinafter shall refer collectively to defendants Jennifer Kreitz, Rhonda Duggan, Bob Gardner, John Peters and Stacy Corless.

32.     Defendant Thomas Boo is the Public Health Officer for Mono County and the Town of Mammoth Lakes. Defendant Boo is named in his official capacities.

33.     The term "County Defendants" as used hereinafter shall refer collectively to the Supervisor Defendants and Defendant Boo.

34.     Defendant Rob Patterson is Finance Department for the Town of Mammoth Lakes, and defendants Ben Manning, Kim Getchell, and Jenna Duncan are Revenue Specialists for the Town.[3] Defendants Rob Patterson, Ben Manning, Kim Getchell, and Jenna Duncan are named in their official capacities.

35.     The term "Finance Defendants" as used hereinafter shall refer collectively to defendants Rob Patterson, Ben Manning, Kim Getchell, and Jenna Duncan.

36.     Defendant Daniel Holler is Town Manager for the Town of Mammoth Lakes. Defendant Daniel Hollar is named in his official capacity.

37.     Defendants Bill Sauser, Lynda Salcido, John Wentworth, Kirk Stapp, and Sarah Rea are members of the Town Council of the Town of Mammoth Lakes.  Defendants Bill Sauser, Lynda Salcido, John Wentworth, Kirk Stapp, and Sarah Rea are named in their official capacities.

38.     The term "Council Defendants" as used hereinafter shall refer collectively to the defendants Bill Sauser, Lynda Salcido, John Wentworth, Kirk Stapp, and Sarah Rea.

39.     The term "Town Defendants" as used hereinafter shall refer collectively to the Council Defendants, the Finance Defendants and Defendant Daniel Holler.

**EFFORTS TO STOP THE SPREAD OF THE CORNAVIRUS IN AND FROM CHINA AND ADDRESS ACCOMPANYING ECONOMIC EFFECTS**

40.     The strictest control measures were applied in Wuhan with a complete lockdown of the population.  Starting at 10 a.m. on 23 January 2020, Wuhan city officials

---

[3] https://www.townofmammothlakes.ca.gov/Directory.aspx?did=7

1    prohibited all transport in and out of the city of 9 million residents. Within the rest of China,

2    the interventions included nationwide traffic restrictions in the form of increased checkpoints

3    at road junctions to reduce the number of people travelling and self-isolation of the population

4    at home to reduce outside activities.  Hundreds of millions of Chinese residents had to reduce

5    or stop their inter-city travel and intra-city activities due to these measures.  The World Health

6    Organization (WHO) indicated that the lockdown of 11 million people is unprecedented in

7    public health history and it certainly was not a recommendation made by the WHO.

8         41.    On January 31, 2020, the United States restricted entry of persons who had

9    been in China.

10        42.    On about February 6, 2020, in the province of Hubei, non-essential enterprises

11   were ordered not to reopen before February 14, 2020.  By the end of February, the number of

12   cases of coronavirus infection in Wuhan had been greatly reduced.  The last confirmed locally

13   transmitted case of the virus was on March 24, 2020, and authorities began lifting the

14   lockdown on about March 29, 2020.  People were not allowed to leave the City until April 8,

15   2020.

16        43.    On March 16, 2020, President Donald Trump announced a 15 day plan to "slow

17   the spread" of the coronavirus pandemic.  The Dow Jones Industrial Average experienced its

18   worst point drop in history.  On March 27, 2020, the President signed the $2.2 trillion

19   Coronavirus Aid, Relief, and Economic Security (CARES) Act.  On March 30, the President

20   extended the guidelines to slow the coronavirus until April 30, 2020.  On April 24, 2020, the

21   President signed the $484 billion Paycheck Protection Program and Health Care Enhancement

22   Act.  These Acts provided small businesses with a forgivable loan if they maintained employee

23   payroll for eight weeks, and provided unemployed persons with greatly enhanced

24   unemployment benefits.  The CARES Act established a 120-day eviction moratorium for

25   evictions based on non-payment of rent for certain covered properties. which moratorium

26   formally ended on July 25, 2020.

27        44.    On December 28, 2020, the President signed the Consolidated Appropriations

28   Act of 2021 which extended the Federal eviction moratorium by one month, included $25

billion in rent relief, and provided COVID-19 relief payments.  The $25 billion in rent relief was directed to the states to disperse as they see fit.

45.     On January 6, 2021, the City of Shijiazhuang, the capital of Hebei Province near Bejing, China, went into a three-day lockdown as the city experienced China's largest COVID-19 outbreak in months.  Officials planned to administer nucleic acid (RT-PCR) COVID-19 tests to the entire population of 11 million people during this period.  On January 9, 2021, it was reported that 354 positive cases had been found and isolated. With aggressive contact tracing, more than 11,000 individuals were placed in designated COVID hospitals, quarantine hotels, and dormitories, or quarantined in their apartments.  Residential complexes with COVID-positive cases implemented disinfection operations in common areas.  By January 12, the number placed into quarantine facilities had risen to over 20,000.  To further contain the spread of COVID-19, the lockdown was extended another seven days.  It is expected that the strict measures would remain in place and there would be another two to three rounds of testing before movement restrictions would be lifted.

## CALIFORNIA'S DECLARATION OF A STATE OF EMERGENCY AND SUBSEQUENT ORDERS

46.     On or about March 4, 2020, Defendant Newsom proclaimed a State of Emergency in response to the spread of COVID-19.[4] Defendant Newsom's emergency proclamation was issued pursuant to Section 8625 of the California Government Code.

47.     Since the March declaration of a state of emergency, Defendant Newsom has issued numerous emergency Orders pursuant to the authority granted him by California law under the declaration of a state of emergency.  The emergency Orders issued by Defendant Newsom and the restrictions implemented pursuant to such Orders are unprecedented in their scope and duration.

---

[4] As of the date of this filing, the Proclamation of a State of Emergency can be found online at: https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.

48.     On March 16, 2020, Defendant Newsom issued Executive Order N-28-20 issued, halting evictions, foreclosures, and utility shutoffs for or Californians affected by COVID-19, through May 31, 2020, which was extended.

49.     On March 19, 2020, Defendant Newsom, invoking the authority granted him under sections 8567, 8627 and 8655 of the California Government Code, issued Executive Order N-33-20, directing all residents to "immediately heed" the State Public Health Officer's directives. The Order further directed all Californians to stay home "except as needed to maintain continuity of operations of the federal critical infrastructure sectors." The Order was issued "to protect the public health", "mitigate the impact of COVID-19", "bend the curve, and disrupt the spread of the virus." The Stay-At-Home Order remains in effect.

50.     On or about March 19, 2020, Sonia Angell, who was then serving as the California State Public Health Officer, acting pursuant to the authority conferred by Governor Newsom's Orders, issued an Order which designated a list of "Essential Critical Infrastructure Workers." The Order incorporated by reference the U.S. Government's 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. The Order provided that "Californians working in these 16 critical infrastructure sectors [would] continue their work because of the importance of these sectors to Californians' health and well-being." All other businesses and organizations were ordered either to cease all operations or to operate under substantial restrictions. Persons not employed in the 16 critical infrastructure areas were required to stay home except as necessary to obtain necessities such food, prescriptions, and healthcare.

51.     On May 4, 2020, Defendant Newsom, again acting pursuant to emergency powers under state law, issued Executive Order N-60-20. This Order permitted businesses to begin reopening in stages, as determined by the State Public Health Officer. It also directed the State Public Health Officer to develop criteria to determine "whether and how . . . local health

officers may . . . issue directives less restrictive than measures . . . implemented on a statewide basis pursuant to the statewide directives of the State Public Health Officer."

52.     On May 7, 2020, State Public Health Officer Angell issued an Order permitting the gradual reopening of businesses and activities in California in stages. The Order provided for four stages of gradual reopening, with the final stage, Stage 4, consisting of an end to all stay-at-home orders and a full reopening of businesses.

53.     On August 3, 2020, the CDPH issued updated guidance on opening schools to in-person instruction, including a section on cleaning and disinfecting touched surfaces at schools and on school buses.[5]

54.     On August 28, 2020, Erica Pan, who was then the Acting State Public Health Officer, implemented a statewide Order that abandoned the previous, staged re-opening plan promulgated in the May 7, 2020 Order.[6]  The August 28, 2020 Order remains in effect at the time of the filing of the Complaint with a September 30, 2020 modification to include an "equity" component.

55.     The August 28, 2020 Order dictates that counties be classified according to a new plan entitled "Blueprint for a Safer Economy" under which a color-coded "tier" system would be used.  Under this system, each county is placed in one of four tiers, Purple, Red, Orange, and Yellow, ranging from most to least restrictive.  Unlike the previous staged reopening plan under the May 7, 2020 Order, the current "tier" system under the August 28, 2020 Order does not provide any criteria under which California's businesses and economy would be permitted to fully reopen.  Under the August 28, 2020 Order, under the respective tiers, restaurants are required to 1.) cease all indoor dining (Purple tier); 2.) limit indoor dining capacity to 25% (Red tier); or 3.) limit indoor dining capacity to 50 % (Orange and Yellow tiers).  In no instance could restaurants open at full capacity for indoor dining under any of the tiers.

---

[5] https://files.covid19.ca.gov/pdf/guidance-schools.pdf
[6] https://covid19.ca.gov/safer-economy/

56.     Defendant Newsom has indicated his intent to implement these tiered restrictions for an indefinite period of time, publicly stating that "This Blueprint is statewide, stringent and slow….We have made notable progress over recent weeks, but the disease is still too widespread across the state. COVID-19 will be with us for a long time and we all need to adapt. We need to live differently. And we need to minimize exposure for our health, for our families and for our communities."  The current statewide Orders therefore include no provision for fully reopening the economy and by their terms continue for an indefinite period into the future.

57.     On August 31, 2020, Defendant Newsom signed the Tenant, Homeowner, and Small Landlord Relief and Stabilization Act (AB 3088), which bans evictions of tenants who cannot pay rent due to COVID-19 hardship through February 1, 2021,  If the COVID-19 hardship occurs between September 1, 2020 and January 31, 2021, tenants must pay at least 25% of rent due to avoid eviction.

58.     On September 4, 2020, the Centers for Disease Control and Prevention (CDC) and the Department of Health and Human Services (HHS) published regulations temporarily halting residential evictions for qualified persons to prevent further spread of COVID-19, effective September 4, 2020 through December 31, 2020.

59.     On November 19, 2020, the Erica Pan, who was then acting as the State Public Health Officer, issued a Limited Stay at Home Order that directs residents in counties in the Widespread (Purple) tier, which includes Mono County, to stop non-essential activities between 10 p.m. and 5 a.m.

60.     On December 3, 2020, the Erica Pan, who was then acting as the State Public Health Officer, issued a Regional Stay Home Order that would be triggered for at least three weeks if a region's adult Intensive Care Unit (ICU) bed capacity drops below the threshold of 15 percent. Mono County was assigned into the Southern California region with 10 other counties.

61.     The Southern California region was formed by combining Mutual Aid Regions I and VI.[7]  Mutual Aid Region I consists of Orange County (population 3.2 million), Los Angeles County (population 10 million), Ventura County (population 0.85 million), Santa Barbara County (population 0.45 million), and San Luis Obispo County (population 0.28 million).  Mutual Aid Region II consists of San Diego County (population 3.3 million), Imperial County (population 0.18 million), Riverside County (population 2.5 million), San Bernardino County (population 2.2 million), Inyo County (population 0.018 million), and Mono County (population 0.014 million).  The population of Mono County is merely 0.14% of the population of Los Angeles County.

62.     Mono County is about 300 miles north of the City of Los Angeles (also in the Southern California region), and about 140 miles southeast of the City of South Lake Tahoe.  South Lake Tahoe is in El Dorado County, which is assigned to the Greater Sacramento region.

63.     The Regional Stay at Home Order ordered, "[e]xcept as otherwise required by law, no hotel or lodging entity in California shall accept or honor out of state reservations for non-essential travel, unless the reservation is for at least the minimum time period required for quarantine and the persons identified in the reservation will quarantine in the hotel or lodging entity until after that time period has expired."[8]  The order also states, "[t]o promote and protect the physical and mental well-being of people in California, outdoor recreation facilities may continue to operate.  Those facilities may not sell food or drink for on-site consumption."

64.     On December 5, 2020, the Southern California region's ICU capacity dropped below the threshold to 13.1 percent, triggering a three-week Regional Stay at Home order for the Southern California region including Mono County.  Defendant Newsom issued the Stay-at-Home order for the Southern California region beginning at 11:59 pm on December 6, 2020.  All gatherings with members of other households were prohibited.

---

[7] California Public Health and Medical Emergency Operations Manual, pages 40 and 49.
[8] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Regional-Stay-at-Home-Order-.aspx

65.     On December 6, 2020, Erica Pan, who was then acting as the State Public Health Officer, issued a supplemental order increasing the operation of grocery stores to 35% of capacity and presenting clarifications to the Regional Stay at Home Order.

66.     On December 10, 2020, a Stay-at-Home order for the Greater Sacramento region was ordered to begin at 11:59 pm.  On January 2, 2021, the Stay-at-Home order for the Greater Sacramento region was extended.

67.     On December 18, 2020, Defendant Newsom attempted to explain ICU capacity in a video, stating: "when you see 0%, that doesn't mean there's no capacity, no one's allowed into an ICU.  It means we're now in our surge phase, which is about 20% additional capacity that we can make available through the ICU system.  I don't want people to be alarmed by that, except I do want to raise the alarm bell about what we all must do individually and collectively to address this rate of growth,".[9]

68.     On December 21, 2020, Erica Pan, who was then acting as the State Public Health Officer issued a Supplemental Order that directs counties under the Regional Stay Home Order, which includes Mono County, to stop non-essential retail activities between 10 p.m. and 5 a.m.

69.     In response to media inquiries about how ICU bed availability be at zero percent when hospitals are reporting that beds are available, the CDPH responded with an algorithm used to adjust actual ICU capacities measures for each of the five regions.[10]  "If a region [in California] is utilizing more than 30% of its ICU beds for COVID-19 positive patients, then its available ICU capacity is adjusted downward by 0.5% for each 1% over the 30% threshold," according to the CDPH.  Dr. Mark Ghaly reportedly stated, "When we have seen hospitals with ICU capacity used up for COVID above 30% we consider … that region's

[9] https://www.pe.com/2020/12/18/what-public-health-leaders-mean-by-0-icu-beds-available/amp/ and https://abc7.com/california-icu-capacity-by-region-bay-area-covid-gov-newsom-update-beds/8879527/ at 00:55.
[10] https://www.bakersfield.com/ap/national/how-can-california-have-0-icu-capacity-and-1-300-available-icu-beds/article_4488fd1d-0ce0-500e-9464-17ab1cc06fd1.html and https://katv.com/news/nation-world/what-you-need-to-know-about-icu-capacity-in-the-united-states

ICU capacity really ill-prepared to serve and support individuals with other sorts of urgent and emergent needs, like heart attacks, strokes, other trauma."[11]

70.     Based on the adjustment algorithm, for a region having an actual ICU bed availability of 20% with 50% of the ICU beds being used for COVID-19 positive patients, it appears that the CDHP would adjust the bed availability to 10%, which would invoke application of the Regional Stay-at-Home Order to the region.  Similarly, for a region having an actual ICU bed availability of 15% with 60% of the ICU beds being used for COVID-19 positive patients, it appears that the CDHP would adjust the bed availability to 0%.  For ICU bed availability numbers, great care must be taken to state, if it can be determined, whether a number is based on actual ICU bed availability or adjusted ICU bed availability.  Further, statements about zero percent ICU bed availability without accompanying disclosure of the actual bed availability, may be unduly alarming, if not blatantly misleading.  For example, San Diego County, which is in the Southern California region, has reported throughout the pandemic of at least 10% current ICU bed capacity, and a licensed ICU bed capacity of several percent more.[12]  On January 22, 2021, in a case involving a church in San Diego County, the United States Court of Appeals for the Ninth Circuit issued an opinion with an alarming first sentence as follows, "[t]he State of California is facing its darkest hour in its fight against the COVID-19 pandemic, with case counts so high that **intensive care unit capacity is at 0% in most of Southern California**" (emphasis added).  See, SOUTH BAY UNITED PENTECOSTAL CHURCH v. GAVIN NEWSOM, No. 20-56358.  The Ninth Circuit failed to clarify whether the 0% ICU capacity is actual capacity, adjusted capacity, type unknown, or, if the actual capacity even matters.

---

[11] https://www.mercurynews.com/2020/12/29/how-can-california-have-0-icu-capacity-and-1300-available-icu-beds/

[12]
https://www.sandiegocounty.gov/content/sdc/hhsa/programs/phs/community_epidemiology/dc/2019-nCoV/status.html

71.     On about December  28, 2020, California began using a region's projected ICU capacity in four weeks for determining whether to lift the Regional Order after three weeks from the trigger date.

72.     On December 29, 2020, Defendant Ghaly announced that the Southern California's Regional Stay Home Order, which includes Mono County, will remain in effect until further notice due to a surge in COVID-19 hospitalization and a lack of ICU capacity.

73.     On December 30, 2020, the Mammoth Lakes Chamber of Commerce sent a letter to Defendant Newsom about the devastating economic challenges caused by his Stay at Home Order and, based on its unique geographic location in the Eastern Sierra, local hospital availability (no currently admitted patients as a result of COVID-19), open businesses in the neighboring State of Nevada, and other reasons, requested to conduct area businesses safely in the purple tier and allow natural cash flow to sustain business rather than insufficient public funding, and to remove Mono County from the Southern California region to a region appropriate with its demographics and geography.

74.     On January 6, 2021, the CDPH issued a Travel Advisory stating, "[e]xcept in connection with essential travel, Californians should avoid non-essential travel to any part of California more than 120 miles from one's place of residence, or to other states or countries," and "non-essential travelers from other states or countries are strongly discouraged from entering California."  In a footnote, the Advisory indicates, "'Non-essential travel' includes travel that is considered tourism or recreational in nature."[13]

75.     The advisory that Californians "should" avoid non-essential travel is clearly only a recommendation and not a mandatory prohibition.  Thus, the Travel Advisory does not prohibit non-essential travel to any point more than 120 miles from one's place of residence, nor does it prohibit non-essential travelers from other states.

76.     On January 12, 2021, the Stay-at-Home order for the Greater Sacramento region was lifted based on its projected ICU capacity.  As of January 16, 2021, the ICU availability in the Greater Sacramento region was 6.2%, on January 20 it was 8.3%, and on

[13] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Travel-Advisory.aspx

January 24 it was 11.9%.[14]  The City of Sacramento is the Capitol of the State of California, and the current residence of the California Governor.  Most of the counties in the Greater Sacramento region, including El Dorado County, are now in the purple tier.  In contrast, early on January 23, 2021, the ICU availability in the Bay Area region was 6.5%, but on January 23 it was changed to 23.4%, with the region remaining under the restrictions of the Regional Stay-at-Home Order.

77.    On January 14, 2021, the CDPH issued guidance on the reopening of in-person instruction in schools.  The guidance includes a section (pages 25 – 27), on the cleaning and disinfection of surfaces at schools and on buses.  The guidance states that staff should clean frequently-touched surfaces at school and on school buses daily.  Frequently touched surfaces in the school include shared tables, desks, or chairs.[15]

78.    On January 23, 2021, Bay Area media reported, "before Friday, it had been a week since California health leaders last provided specific ICU capacity percentages, the key data point Newsom's administration has said would help determine which regions remain under his mandated stay at home order.  All week, the state would not provide the numbers, only writing in email updates vaguely [sic] saying three regions: the Bay Area, Southern California and San Joaquin Valley remain under the order, their four week ICU capacity projections do not meet criteria to exit."[16]  Without using and reporting the data used to implement and continue its actions restricting the activities of California residents, the State had no basis for its arbitrary continuation of its Orders and restrictions.

79.    On January 24, 2021, the State on its website showed an ICU capacity of 0% for the Southern California region.[17]  On January 25, the CDPH announced the end to the Regional Stay at Home Order for the Southern California region and two other regions.  The

---

[14] https://covid19.ca.gov/stay-home-except-for-essential-needs/
[15] https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Consolidated_Schools_Guidance.pdf
[16] https://www.kron4.com/news/bay-area/bay-area-sees-significant-jump-in-icu-bed-capacity/
[17] About COVID-19 restrictions - Coronavirus COVID-19 Response (ca.gov)

1   CDPH released a 4-week ICU projection of 33.3% for the Southern California region.[18]  The

2   action returned all counties to the rules and framework of the Blueprint for a Safer Economy.

3        80.    On its website, the California State Parks gave this information during the

4   Regional Stay at Home Order:  "While the Regional Stay at Home Order is asking Californians

5   to stay home as much as possible and for certain sectors to close, the state recognizes that

6   outdoor activity is critical for mental health and physical health. As such, we welcome you to

7   recreate in the outdoors provided that you stay local, plan ahead to find out what is open, wear

8   a face covering, practice physical distancing and avoid gatherings with people outside the

9   immediate household."[19]

10       81.    On information and belief, during the COVID-19 pandemic, the State of

11  California, Mono County, and/or the Town of Mammoth Lakes, have not implemented road

12  blocks enforcing prohibitions of non-essential travel on its roads or highways to limit the

13  spread of COVID-19.

14

15  **LOCAL HEALTH ORDERS AND RESTRICTIONS IN RESPONSE TO**

16  **CORNAVIRUS**

17       82.    On March 15, 2020, Defendant Boo, as the Mono County Health Officer,

18  declared a local health emergency due to the imminent and proximate threat to public health of

19  the introduction of a novel coronavirus (COVID-19) in Mono County, and on March 17, 2020,

20  the Mono County Board of Supervisors ratified the County Health Officer's declaration of

21  emergency, which declaration remains in effect.

22       83.    On March 17, 2020, Defendant Boo, as the Mono County Health Officer issued

23  orders prohibiting all non-essential public gatherings, closing all bars, breweries, and wine-

24  tasting venues with customer contact, limited restaurants to drive-through, pick-up, or

25  delivery, and closed indoor and outdoor seated dining, closed health club and gyms, directed

26  that theatres, bowling alleys, and other indoor recreation venues should close.

27

28  [18] www.cdph.ca.gov/Programs/OPA/Pages/NR21-030.aspx
    [19] https://www.parks.ca.gov/?page_id=30350

84.     On March 18, 2020, the Mammoth Lakes Town Council declared a local emergency regarding COVID- 19, and the declaration of emergency remains in effect.

85.     On March 21, 2020, Defendant Boo, as the Mono County Health Officer, issued an order allowing "the use of hotels and other facilities for emergency service workers, essential service workers, for displaced residents needing shelter, for traveler safety, and other response and mitigation efforts related to COVID-19,"

86.     In March 2020, Steve Barwick, as the Mono County Administrative Officer, issued a memorandum on the subject of limiting use of short-term rentals asserting that the Governor's Stay at Home order of March 19, 2020, and County Health Officer's Order of March 21, 2020, "clarifying that Order do not extend exemptions for property owners to provide employees for hotels, or by extension, any short-term rental services, for any other purposes."

87.     On April 1, 2020, Defendant Boo, as the Mono County Health Officer issued an order directing that hotels, motels, short-term rentals, vacation rentals, timeshares, campgrounds, RV parks, and other lodging facilities not operate except to provide shelter to the homeless population; to persons who have been displaced due to living with someone who is isolated or quarantined due to COVID- 19; persons who need to isolate or quarantine themselves due to COVID- 19; and essential workers performing functions to maintain critical infrastructure.

88.     On April 10, 2020, Defendant Holler, as Town Manager, issued a memorandum to Town Staff, ordering "that the business tax certificate for a lodging property may be revoked if the property is found to have been rented on a short-term basis in violation of an order from the Governor or the County Health Officer . . . ."[20]

89.     On April 22, 2020, the Town Council of Mammoth Lakes adopted Urgency Ordinance No. 20-05 stating that the COVID-19 pandemic "has resulted in a significant decrease in the Town's primary source of revenue: transient occupancy tax (TOT)," and

---

[20] https://webapps.mono.ca.gov/COVIDDocs//Directives/TOT%20-%20Municipal%20Code%20Updates%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.pdf

amending Municipal Code (MLMC) section 3.12.080 to require monthly remittance (by the 20th) of the TOT filed with "any other . . . information relating to rentals as requested by the tax collector."  Ordinance No. 20-05 further included amendment of MLMC section 5.04.340 to allow revocation of a business's tax certificate if "it appears to the tax collector that a business is being conducted or has been conducted in a manner that violates one or more application laws, regulations, and/or orders of governmental authorities (including without limitation orders of the Mono County Health Officer) . . . ."  The tax collector shall provide written notice to the operator of the apparent violation, and the operator shall be provided with not less than five days in which to demonstrate the alleged violation did not occur.  If the certificate holder cannot or does not provide evidence satisfactory to the tax collector, the tax collector may revoke the operator's business tax certificate for a period of one year.  The code section does not define the difference between an apparent violation and an alleged violation, nor does it define or even hint at a definition of what constitutes satisfactory evidence.  Nevertheless, the apparent violation relates to the manner a business is being conducted or has been conducted, and a written notice failing to provide a description of the conduct giving rise to the appearance of a violation is lacking under the requirements of the subject code section.  Further, the only remedy for failing to provide satisfactory evidence is revocation of the business tax certificate.  Also, MLMC section 5.04.340 fails to authorize the tax collector to issue an administrative citation or impose a fine for failing to provide satisfactory evidence within the not less than five day demonstration period.

90.     On May 18, 2020, Defendant Boo, as the Mono County Public Health Officer, issued an order superseding the Mono County Health Officer Order of April 1, 2020, clarifying the continuation of the short-term lodging restrictions, and allowing unit maintenance and repairs by owners.  The Order asserts, "7. This Order is made because of the propensity of the virus to spread person-to-person and also because the virus is **causing physical property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time**" (Emphasis added).[21]  Reports show that the language highlighted above arose

---

[21] https://webapps.mono.ca.gov/COVIDDocs//Directives/Short-Term-Rental-Order-Extension-2020-05-18-

from efforts to support business insurance coverage based on health orders.[22]  On March 16, 2020, a proclamation by the Mayor of City of New Orleans includes, "WHEREAS, there is reason to believe that COVID-19 may be spread amongst the population by various means of exposure, including the propensity to spread person to person and the propensity to attach to surfaces for prolonged periods of time, thereby spreading from surface to person and causing property loss and damage in certain circumstances; . . . ."[23]  The reports quote an attorney giving the New Orleans language to an official of the City of Key West, Florida.  On March 21, 2020, the City of Key West issued a State of Local Emergency Directive, stating, "WHEREAS, this order is given because of the propensity of the virus to spread person to person and also because the virus is causing property damage due to its proclivity to attach to surfaces for prolonged periods of time."[24]  According to the reports, there is no indication of medical or scientific review by Key West officials of the language in the New Orleans proclamation, or in the deletion of the language, "thereby spreading from surface to person" and "in certain circumstances," in the Key West directive.  This language from the Key West directive was copied into orders and declarations of numerous other jurisdictions.  For example, an Order by the City Manager for the City of Aventura, Florida, executed March 24, 2020, included a finding that, "(C) This Order is given because of the propensity of COVID-19 virus to spread person to person and also because the virus physically is causing property damage due to its proclivity to attach to surfaces for prolonged periods of time." [25]

91.    All Mono County public health ordered issued from May 18, 2020, and forward, include the physical property loss and damage provision of quoted above from the order of May 18, 2020.

---

English.pdf
[22] https://www.claimsjournal.com/news/national/2020/05/13/297037.htm
[23] http://nola.gov/mayor/executive-orders/emergency-declarations/03162020-mayoral-proclamation-to-promulgate-emergency-orders-during-the-state-of-emergency-due-to-co/?utm_campaign=City_of_New_Orleans&utm_content=&utm_medium=email&utm_source=govdelivery&utm_term=
[24] https://www.cityofkeywest-fl.gov/DocumentCenter/View/1660/Emergency-Directive-2020-03?bidId=
[25] https://www.cityofaventura.com/DocumentCenter/View/2600/DSE-supp-03-24-2020-home

92.     On May 28th, 2020, Defendant Boo, as the Local Health Officer for Mono County and the Town of Mammoth Lakes, issued an order for the safe operation of campgrounds and RV parks at 75% of their normal capacity, or with provision of 20 feet between campsites.  The order states, "4. Bathrooms must be closed to guests OR be frequently and diligently cleaned. This requires cleaning at regular intervals of between 15 minutes and 1 hour in a meticulous, careful and conscientious manner, with the goal of accomplishing a thorough cleaning and disinfecting. Note that if bathrooms are closed, tent camping must be prohibited."[26]

93.     June 18, 2020, Defendant Boo, as the Local Health Officer for Mono County and the Town of Mammoth Lakes, issued an order rescinding the health order of Mach 18, 2020, and allowing lodging at hotels and condo/hotels within the Town of Mammoth Lakes at 75% of capacity, and lodging at short-term residential rental units with a 24-hour period vacancy between each occupancy.  Lodging business were required to certify at the County's self-certification portal on its website.

94.     On August 11, 2020, Defendant Boo, as the Local Health Officer for Mono County and the Town of Mammoth Lakes, issued an order superseding the order of June 18, 2020, with further cleaning and laundry requirements, and reducing hotel occupancy to 70%. This order only applies to lodging in the Town of Mammoth Lakes.

95.     On November 17, 2020, Defendant Holler, as Town Manager/Emergency Services Director of the Town of Mammoth Lakes, issued an order limiting all short-term lodging properties to a vacancy factor of thirty percent (30%).

96.     On November 18, 2020, Defendant Boo, as the Local Health Officer for Mono County and the Town of Mammoth Lakes, rescinded the public health order of August 11, 2020.

97.     On December 5, 2020, Defendant Boo, as the Local Health Officer for Mono County and the Town of Mammoth Lakes, issued an order directing that lodging facilities may

---

[26] https://webapps.mono.ca.gov/COVIDDocs//Directives/Order-Private%20Campgrounds%20and%20RV%20Park%20Guidance_2020-05-29.pdf

remain open for purposes such as to provide shelter to the homeless population; to persons who have been displaced due to living with someone who is isolated or quarantined due to COVID- 19; persons who need to isolate or quarantine themselves due to COVID- 19; essential workers performing functions to maintain critical infrastructure, or persons displaced due to fire.  Renting or leasing for other purposes was prohibited.

98.     By at least December 2020, the Finance Department of the Town of Mammoth Lakes issued a two page TRANSIENT RENTAL RESTRICTION EXEMPTION CLAIM FORM.  For rentals less than 31 days, the "operator must include the advanced written approval of rental along with this exemption form for consideration."  The form also instructs, "it is strongly recommended that you secure advanced written approval by the Town Finance Department.  Submission of this exemption form and documentation does not guarantee approval.  The exemption claim from the Transient Rental Restriction shall not be approved unless this form is completed and the person requesting the exemption presents required documentation.  A copy of the documentation from the person requesting the exemption shall be attached to each exemption claim."  The form is confusing in that one part states "operator must include the advanced written approval of rental," whereas another part states, "it is strongly recommended that you secure advanced written approval by the Town Finance Department."  The form does not instruct why a claim with the required documentation would not be approved by the Finance Department.  At the bottom of the form is a statement (bold underlined all-caps font) that the claim form should be submitted to the town with the monthly transient occupancy tax (TOT) return submitted by the 20th of each month.

99.     The statement that the claim form "should" be submitted to the town  is clearly only a recommendation and not a mandatory prohibition.  Thus, the statement at the bottom of the claim form does not require the claim form to be submitted with the TOT return.

100.     In a joint meeting of the Board of Supervisors of Mono County and the Town Council of Mammoth Lakes on December 23, 2020, numerous speakers and elected officials asserted that visitors to the Mammoth Mountain Ski Resort were defying the State's Stay-at-

1   Home Orders by lodging in Bishop and then coming during the day to ski at the Resort, which

2   remains open during the shutdown.

3         101.    On January 7, 2021, Defendant Sauser and Defendant Kreitz forwarded a joint

4   letter to Defendant Newsom "pleading for" his "support to shift Mono County out of the

5   enormous Southern California Region."  The letter further emphasizes,

> Throughout the pandemic, Mammoth Hospital, the only hospital in Mono
> County, has been able to operate within its capacity, and has yet to experience
> any surge in COVID-19 patients.  The hospital has developed surge plans and
> is ready to support and manage any increase in patients.  We have seen a very
> small number of people hospitalized throughout the pandemic.  Mammoth
> Hospital continues to operate in the 'Green' status, meaning they can provide
> usual or conventional level of care, and our primary support diversion
> hospitals are in Northern Nevada (i.e., Renown Hospital in Reno and Carson
> Tahoe Hospital in Carson City), not Southern California . . . .  We are now
> facing the fact that our business community is suffering unparalleled
> economic devastation because of the Regional Stay-at-Home Order that went
> into effect December 6, 2020.  Our residents' financial survival is dependent
> upon a tourism-based economy, for which the winter holiday period is critical.
> The financial loss over last winter and this winter holiday season has multiple
> businesses on the brink of permanently closing or bankruptcy.  Business
> closures, job losses and reduced payrolls have impacted owner and thousands
> of employees.  The status of the Regional Stay-at-Home Order will continue
> to devastate local businesses, resulting in higher levels of unemployment and
> lost revenues to support local government."

> The most compassionate approach that balances the risks and benefits of
> reaching herd immunity, is to allow those who are at minimal risk of death to
> lead their lives normally to build up immunity to the virus through natural
> infection, while better protecting those who are at highest risk. We call this
> Focused Protection.

> Adopting measures to protect the vulnerable should be the central aim of
> health responses to COVID-19. By way of example, nursing homes should
> use staff with acquired immunity and perform PCR testing of other staff and
> all visitors. Staff rotation should be minimized. Retired people living at home
> should have groceries and other essentials delivered to their home. When
> possible, they should meet family members outside rather than inside. A
> comprehensive list of measures, including approaches to multigenerational
> households, can be implemented, and is well within the scope and capability
> of public health professionals.

         102.    The letter goes on to address the conflicting guidance provided by Defendant

Newsom and the State regarding outdoor recreation:

> We are experiencing the COVID-driven impacts of tourism and visitation
> without having the ability to manage and support our visitor's safety.  Upon
> releasing the Regional Stay-at-Home Order, you noted that outdoor recreation
> would remain open to support the mental health of the state's residents.  While

we support this decision, the availability of outdoor recreation, and our position as a popular escape from urban areas, has put our County and Town in a difficult position.  Mammoth Resorts' ski areas are permitted to continue operating under strict safety guidelines, and there are many second homes and vacation properties that draw people to our area.  Enforcement of the Regional Stay-at-Home Order at the local level is quickly outstripping our finite capacity, despite efforts to discourage visitation.  We work closely with public health officials at the local and state level, enjoy a productive relationship with Mammoth Resorts' leadership team, meet weekly with local businesses owners, and host regular virtual community meetings.  Our community is well informed.  Our businesses are committed to operate, as they have done since the start of the pandemic, with the safety of employees, residents, and our visitors as their utmost concern. However, closed businesses cannot support enforcement efforts.  The State's inability to provide meaningful enforcement under the existing Regional Stay-at-Home Order to limit travel is creating growing conflict among our local businesses, local government leaders, and public health officials.  We are experiencing increasing levels of illegal short-term rental activity to the detriment of establishments striving to comply with the Regional Stay-at-Home Order.  This illegal activity reduces any ability to enforce safety protocols and cleaning standards.

The most compassionate approach that balances the risks and benefits of reaching herd immunity, is to allow those who are at minimal risk of death to lead their lives normally to build up immunity to the virus through natural infection, while better protecting those who are at highest risk. We call this Focused Protection.

Adopting measures to protect the vulnerable should be the central aim of health responses to COVID-19. By way of example, nursing homes should use staff with acquired immunity and perform PCR testing of other staff and all visitors. Staff rotation should be minimized. Retired people living at home should have groceries and other essentials delivered to their home. When possible, they should meet family members outside rather than inside. A comprehensive list of measures, including approaches to multigenerational households, can be implemented, and is well within the scope and capability of public health professionals.

103.    On January 8, 2021, Defendant Rob Patterson as Tax Collector/Finance Director of Finance Department of the Town of Mammoth Lakes, sent an email to the "Lodging Community" reiterating the restriction on lodging in the Town under the various health orders, and informing of capacity limits of 30% of capacity for hotels and similar properties, and limits of 10 rental days per unit per month for operators with less than 10 privately owned properties.  Attached to the email was a 1 page updated TRANSIENT RENTAL RESTRICTION EXEMPTION CLAIM FORM.  The form describes the new capacity restrictions, but did not include the documentation requirements nor the advanced written approval language.

104.    On January 9, 2021, Defendant Dr. Boo, as the Local Health Officer for Mono County and the Town of Mammoth Lakes, issued a clarifying order in light of the DCPH's January 6, 2021 Travel Advisory, with a new section on quarantining out of state residents. This order is referenced in the January 8 email from Defendant Rob Patterson, and is identified in the email with a date of January 7, 2021.

105.    On January 11, 2021, the City Council of the City of Bishop approved the sending of a joint letter with the County of Inyo to AIRBNB at the request of Mono County and the Mammoth Lake Town Council discouraging bookings for lodging in Bishop and Inyo County.[27]

106.    On January 20, 2021, Attorneys for the Plaintiffs sent a letter to Defendant Holler and Town Attorney Andrew Morris, on behalf of the Mammoth Lakes Business Coalition and the California Constitutional Rights Foundation, providing notice requesting the Town to stop its extreme enforcement actions violating the businesses' constitutional rights. The letter informs that the Attorneys had "reviewed several Administrative Citations, issued by Revenue Specialists in the Town's Finance Department, imposing $1000 fines, and threatening further fines of $1000 per day and revocation of business licenses/certificates.  The citations we reviewed failed to provide adequate notice of the violations and/or failed to assert anything more than mere suspicions."  The letter summarizes the rights violated and concludes with a demand that the unlawful citations and violations "be rescinded immediately and that fines imposed pursuant to these citations be discharged at the same time.  Failure to do so will bring legal action."

107.    On January 25, 2021, on the Town's website under Coronavirus Update, the posted a news flash stating the "Mono County Public Health Officer Order related to Lodging Facilities issued on December 5, 2020 and revised on January 9, 2021 is no longer in effect, but a new order is forthcoming."  The news flash state stated Mono County will re-enter the Tier 1 Widespread (Purple) of the Blueprint for a Safer Economy, with capacity limits of 60% of capacity for hotels and similar properties, and limits of 18 rental days per unit per month for

---

[27] https://www.youtube.com/watch?v=AW9p7l9oTSg (at 1:44:20)

operators with less than 10 privately owned properties.[28]  Short-term lodging facilities are required to maintain a 24-hour vacancy period between each occupancy.  The news flash quotes Defendant Boo as follows, "in addition to the State's Purple Tier restrictions, as a local jurisdiction we feel it is incumbent upon us to strive to limit the number of visitors to Mono County and Mammoth Lakes during this precarious time by imposing tier-based lodging restrictions and some limits on visitation to our local ski resorts."

108.    On January 25, 2021, on the Mono County Health Department issued a Press Release, under the name of Defendant Boo and Stuart Brown of the Unified Command Emergency Operations Center.  The press release had a similar wording as the Town's news flash, and imposed similar limits on hotels and lodging.[29]  The Press Release has the same quote of Defendant Boo of limiting visitors to Mono County and Mammoth Lakes by imposing lodging restrictions and limits on visitation to local ski resorts.

109.    On January 27, 2021, Defendant Rob Patterson as Tax Collector/Finance Director, sent an email to the "Lodging Community" informing of the end of the Regional Stay-at Home Order and informing of updated processes effective February 1, 2021.  In the updated processes, visitation and reservations are no longer restricted to essential workers, stating exemption form are not necessary for reservation starting January 25, 2021, but are required to be submitted with the TOT tax return due February 22, 2021 for lodging transactions prior  to January 25, 2021.  The Town limitation on occupancy for was updated to 70% of capacity for hotels and similar properties, and limits of 21 rental days per unit per month for operators with less than 10 privately owned properties.  Further, in order to reduce weekend visitation, the 21 rental days per month can only cover 3 weekends per month.  One weekend per month must remain vacant (Friday and Saturday night).  This restriction does not

---

[28] www.townofmammothlakes.ca.gov/CivicAlerts.aspx?AID=721
[29] https://webapps.mono.ca.gov/COVIDDocs//PressReleases/PR_REGIONAL%20STAY-AT-HOME%20ORDER%20LIFTED%20FOR%20SOUTHERN%20CALIFORNIA%20REGION%20-%20MONO%20COUNTY%20REASSIGNED%20TO%20PURPLE%20TIER_1-25-2021.pdf

include stays by the owner.  All lodging facilities are required to maintain a 24-hour vacancy period between each occupancy, including owner stays.

110.    The Municipal Code of the Town of Mammoth Lakes allows a "a onetime late payment charge in the amount of twenty-five dollars, plus interest at the maximum rate permitted by law."  See, MLMC section 8.32.100.  The Municipal Code also provides, "[t]he failure of any person to pay the civil fines assessed by an administrative citation within the time specified on the citation may result in the matter being referred to the town attorney to file a claim with the applicable court. Alternatively, the town may pursue any other legal remedy to collect the civil fines, including, but not limited to, a lien pursuant to Section 8.20.120 or special assessment pursuant to Section 8.20.130."  Id.  The Municipal Code does not provide for fines or late payments charges of $1,000 per day for late payment of a civil fine assessed by an administrative citation.

## LOCAL HEALTH ORDERS AND RESTRICTIONS IN RESPONSE TO CORNAVIRUS

111.    Plaintiffs have, in addition, been subjected to Orders and enforcement measures implemented under color of state law by Mono County, California and the Town of Mammoth, California.

112.    On January 21, 2021, at about 2 pm, Defendant Getchell emailed a Town of Mammoth Lakes Administrative Citation, Original Citation Number 033-162-104-00-1, to Cindy Abshire who resides in San Clemente, California.  Under the Code Violation(s) column, the first listed code violation is "Mono county Public Health Officer Order," and under the corresponding Description(s) of the Violations column is "Clarification of CDPH 'Regional Stay-at-Home' Order as Related to Lodging Facilities.  The second listed code violation is "URGENCY ORDINANCE OF THE TOWN COUNCIL," and the corresponding description of the violation is "ORDINANCE NO. 20-05."  The third listed code violation is "MLMC 8.32," and the corresponding description of the violation is "Civil Penalties & Authority."  The box is checked for a 1st violation fine of $1,000.  Boxes are checked for "VIOLATIONS

SHALL BE REMEDIED OR OTHERWISE CORRECTED:" and "Immediately."  The citation has a box with the apparently pre-formatted text, "To correct violation(s) and avoid further citations during the COVID19 pandemic you must:" followed by "PAY THE FINE LISTED ABOVE TO THE TOWN OF MAMMOTH LAKES BY JANUARY 26, 2021.  THE PROPERTY OWNER OR TRANSIENT RENTAL OPERATOR IS SUBJECT TO A SEPARATE $1,000 FINE EACH AND EVERYDAY OF CONTINUED VIOLATION."  The next box has the language, "THIS ADMINISTRATIVE CITATION CONSTITUTES AN ORDER PROHIBITING THE CONTINUATION OR REPEATED OCCURENCE OF THE VIOLATION(S) DESCRIBED HEREIN. [X] NOTICE OF NON-CORRECTION of violation. If this box is checked, you have failed to correct or otherwise remedy the violation within the correction period and you are ordered to pay the fine."  The citation further states, "Notice of Violation by: [X] Certified Mail."

113.    The citation has no description of the date of the violation, or the conditions or actions constituting a violation in the description of the violations.  The correction of the violation apparently consists of paying the fine by January 26, 2021, and a separate $1,000 fine for each and everyday of continued violation.  The continued violation appears to be non-payment of the fine by January 26, 2021.  Further, the citation asserts it is notice of non-correction of the violation without any previous notice of a violation or opportunity to correct. Additionally, the citation was not received by certified mail.

114.    On January 21, 2021, at about 2:30 pm, plaintiff Cindy Abshire received a telephone call from Defendant Getchell about the citation while driving.  Plaintiff Timothy Abshire, her husband, was a passenger in the vehicle.  Plaintiff Cindy Abshire was confused by the call having no knowledge of the citation, and asked her husband to respond since she was driving.  Plaintiff Timothy Abshire located the citation email on her phone and asked Defendant Getchell for the amount of the fine and the reason for it.  Defendant Getchell stated she saw reviews on Airbnb and demanded their Airbnb records from the date of December 7, 2020, to the current date.  Defendant Getchell stated it looked like there were five infractions, and each infraction would be $1,000, but could not tell the amount because she had not

reviewed the financial records.

115.    Plaintiff Timothy Abshire responded that they had paid their license fees and taxes (TOT) for the month and were not then notified that they were in violation.  Defendant Getchell responded that did not matter and it was their job to stay up to date on the laws and regulations.  Plaintiff Timothy Abshire ended the conversation with Defendant Getchell telling her he needed to speak with Plaintiff Cindy Abshire, and call her back.

116.    About 30 minutes later, the Abshires changed driver and passenger positions. Plaintiff Cindy Abshire called Defendant Getchell asking what she needed from them. Defendant Getchell responded she needed their financial records from Airbnb by January 26, 2021.  Plaintiff Cindy Abshire explained they were on their way to their property in Mammoth Lakes.  Defendant Getchell told her that if their main residence is more than 120 miles away from their property in Mammoth Lakes, then their trip was a violation and could be an infraction.  Plaintiff Cindy Abshire responded this was a misunderstanding and would provide her financials as soon as possible, and explained she had been out of work for over nine month and the fines could be a tipping point causing them to lose the property and other long-lasting financial effects.  Defendant Getchell response was, "Well ma'am, we are in the middle of a pandemic and this is the law."  She further stated that it no concern of hers if they lost their property.

117.    After January 26, 2021, Defendant Getchell informed Plaintiff Cindy Abshire of additional fines of at least $1,000, for late payment of the original fine(s).

118.    On December 21, 2020, Plaintiff Defendant Duncan issued an Administrative Citation for $1,000 (alleging a 3rd Violation) to Plaintiffs Alan and Monica Butt, who reside in Glencoe, California, for violating the Mono County Public Health Order by the designation Clarification of CDPH "Regional Stay-at-Home" Order as Related to Lodging Facilities dated December 5, 2020.  The Defendants have not received a previous violation.  The form indicates a fine of $100 for a first violation.

119.    The citation has the following Original Citation Number 8464 12.21.20.  Under the Code Violation(s) column, the first listed code violation is "Mono county Public Health

Officer Order," and under the corresponding Description(s) of the Violations column is "Clarification of CDPH 'Regional Stay-at-Home' Order as Related to Lodging Facilities (dated December 5, 2020 attached to this citation for reference)." The second listed code violation is "MLMC 8.32," and the corresponding description of the violation is "Civil Penalties & Authority." Boxes are checked for "VIOLATIONS SHALL BE REMEDIED OR OTHERWISE CORRECTED:" and "Immediately." The citation has a box with the text, "To correct violation(s) and avoid further citations during the COVID19 pandemic you must: Cease all transient rental advertising and cancel all reservations through the CDPH Regional Stay at Home Order and for any past or future exemption claims email all exemption documentation to the finance department: document@townofmammothlakes.ca.gov for review prior to approval or denial."

120. The citation is accompanied by a letter reciting reports of their son working on the property, and complaints of "loud parties, and occupants staying there who are not members of the immediate household." The letter further states that a stay-at-home order states, "you should not travel more than 3 hours from your primary residence. Gencoe [sic] is located outside of a three hour drive." The letter further states, "If you continue to disobey the order, we will pull your Business Tax Certificate for 1 year. You would not be able to rent your units for 1 year once the ban is lifted."

121. The letter provides no hint on how the person lodging the complaint determined the "members of the immediate household." Further, a search of the Stay-at-Home Order can find no language to the effect that travel more than 3 hours from one's primary residence is not recommended. The line-of-sight distance between Glencoe, California and Mammoth Lakes is 102 miles.

122. During January 2021, several property owners under contract with Plaintiff Nomadness received citations from Revenue Specialists in the Finance Department of the Town of Mammoth Lakes. At least one administrative citation was issued after January 25, 2021, when the Regional Stay-at-Home Order was lifted, the news flash on the Town's website was posted, and the Press Release was issued by the Mono County Health Department. This

citation failed to identify a date of an apparent violation and failed to provide a description of the apparent violation. A notice letter accompanying this citation similarly failed to provide such details of the apparent violation. The issuance of a citation with the notice letter violates the 5 days period of MLMC section 5.04.340 for providing sufficient evidence of no violation. This citation further states, "**THE PROPERTY OWNER OR TRANSIENT RENTAL OPERATOR IS SUBJECT TO A SEPARATE $1,000 FINE EACH AND EVERYDAY OF CONTINUED VIOLATION**" even though the Regional Stay-at-Home Order had been lifted and the Mono County Public Health Officer Order, issued on December 5, 2020 and revised on January 9, 2021, was no longer in effect. Another property owner, in response to receiving a administrative citation, immediately paid the $1,000 fines to avoid further daily fines of $1,000. Immediately, and well in advance of the 20th of the month deadline of MLMC section .3.12.080, Nomadness and the property owner provided evidence to the Town's Revenue Specialist that should be sufficient to show no violation. The evidence included a completed Transient Rental Restriction Exemption Claim Form. On information and belief, the property owner has not yet received repayment of the improperly imposed $1,000 fine.

123. On December 9, 2020, a member of the Plaintiff Coalition received an email from the Town of Mammoth Lakes informing her of the Town's restrictions on short-term lodging rentals until December 28, 2020, and that violations would result in $1,000 fines and/or loss of the violator's business tax license. The member has not received and citation and desires to not be identified to avoid attention. The member had lodging guests check-in to the subject property on December 5, 2020, before Defendant Newsom's Stay-at-Home Order took effect. The member called the State of California's coronavirus hotline and asked the representative if the checked-in guests were able to stay. The hotline representative stated that since the guests had checked-in before the Order went into effect and were also staying for 14 days, which is the quarantine period, they would be allowed to continue their stay. The member called the telephone number listed in the email from the Town of Mammoth Lakes to confirm this position that the guest could stay, and left a voicemail for Defendant Patterson.

After no response, the member called the telephone number two more times, and on the second attempt was able to speak with Defendant Patterson.  Defendant Patterson responded that the "stragglers" had been given enough time and needed to be out.  The member told Defendant Patterson that there was no way to enforce that eviction since the member doesn't live there. Defendant Patterson said to call the guests and let them know that if they don't leave, the Town can have someone go out and knock on the door to let them know to vacate.  The member said that that seemed a bit extreme, and said they would contact the guests.  The member messaged the guests (as well as involved Airbnb), and the guests responded that since they had checked in prior to the Order's effective date, and because they were staying for 2 weeks (the quarantine period), they were exempt.  The member did not push the issue any further, and the guests finished out their stay.  The member calculates that, as of January 21, 2021, $8,725 in reservations have been canceled in 2020 and 2021 due to enforcement of the Orders and/or regulations prohibiting lodging for the prospective guests who had reserved the member's property.

**MONO COUNTY AND THE TOWN OF MAMMOTH LAKES HAVE EXPERIENCED RELATIVELY LITTLE IMPACT FROM COVID-19**

124.    During the ten-month period since Defendant Newsom proclaimed a State of Emergency, Mono County has experienced relatively little impact from COVID-19.

125.    Mono County, with a population of approximately 14,000, has on information and belief, experienced a total of about 875 cases of COVID-19.  (The Town of Mammoth Lakes has a population of approximately 8,000.)  In addition, on several occasions the Hospital and the Town have indicated that the status of Mammoth Hospital is Green, which means the hospital is able to care for any patients requiring admission.

126.    Of the total number of COVID-19 cases in Mono County, there have been 4 deaths attributed to the virus since the State of Emergency was proclaimed. On information and belief, as of January 6, 2021, the ICU capacity of Mammoth Hospital is ten, and there were no occupied ICU beds with persons infected with COVID-19 or otherwise.

127.     During the period May 20 through December 6, 2020, plaintiffs rentals, Coalition members and other lodging in Mono County were at least partially reopened for lodging.  On information and belief, there is no evidence that this resulted in an increase in COVID-19 cases in Mono County or elsewhere.

128.     As of the date of the filing of the Complaint in this matter, defendants have provided no evidence linking the operation of lodging with the transmission of COVID-19 in Mono County.

129.     On information and belief, as of the filing of the Complaint, there is no evidence that a case of COVID-19 can be traced to businesses in the Town of Mammoth Lakes.

**EFFORTS TO CONTAIN COVID-19 BY THE STATE OF CALIFORNIA, MONO COUNTY, AND THE TOWN OF MAMMOTH LAKES, HAVE REPEATEDLY FAILED AND THE CONTINUATION IS IRRATIONAL AND DEVASTATING**

130.     During the ten-month period since Defendant Newsom proclaimed a State of Emergency, Los Angles County and the surrounding urban area has experience an unprecedented surge in COVID-19 cases.  By deeming a large segment of the community as "essential," the State as created a constant transmission vector for the virus.

131.     With the advent of the cold and flu season in the State of California, the pools of infected persons maintained by the persons deemed as essential by the State was significantly widespread to allow regional ignition of a surge of infections of previously uninfected person that typically accompanies the season.

132.     The cold and flu season corresponds with the ski season.  After 9 months of failed measures, the State implemented a Regional Stay-at-Home order that had, during the 1 1/2 month of its imposition, little discernable effect on the spread of the infections beyond the typical curve of viral infections attributable to the cold and flu season.  However, the Regional Stay-at-Home order was devastating to the financial conditions of the businesses operating in the Town of Mammoth Lakes.

133.    The State has permitted and encouraged persons to engage in outdoor activities, While recently discouraging distance travel, the Mammoth Mountain Ski Resort is an irresistible attractions for ski enthusiasts.  Absent closure of the ski resort, or manned road blocks on the highways to the ski resorts, the ski enthusiasts will find their way to Mammoth Mountain.

134.    With the steady stream of visitors from the urban populations of the Southern California region, which continues to experience a surge in COVID-19 cases, Mono County and the Town of Mammoth Lakes will continue to have an influx of infected persons.

135.    Inherent in the outdoor activities is the need to travel to the venue of the outdoor activity.  It is irrational for the Defendant to encourage outdoor activities and give guidance suggesting that the travel to outdoor facilities is not permissible, or being sufficiently vague as to cause local officials to consider the travel to outdoor facilities to be illegal.

136.    Mono County and the Town of Mammoth Lakes are irrational in their efforts to contain the spread of the virus based on forbidding "non-essential" lodging in the Town while permitting persons to eat, drink, and lodge at the Mammoth Mountain Ski Resort.

137.    The Defendants have cutoff the plaintiffs' normal and economical use of their private property for the public purpose of purportedly limiting the spread of the virus without fair, reasonable, and just compensation.

138.    The Defendants have not provided evidence that single household lodging promotes the spread of COVID-19 cases.  There ample evidence that surfaces can be cleaned and disinfected between the provision of lodging to separate households.  Long waits of 24 hours or several days on one weekend a month, but not the other 3 weekends, are not rational. Asserting evidence of viral properties based on cutting and pasting language from other jurisdictions attempting to invoke business insurance is unfair in proportion the devastating harm caused. is arbitrary and unfair.

///

///

# **FIRST CAUSE OF ACTION**

**(42 U.S.C. § 1983-Fourteenth Amendment Substantive Due Process)**

139.    Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

140.    The Due Process Clause of the Fourteenth Amendment includes a substantive component that bars arbitrary wrongful, state action regardless of the fairness of the procedures employed. *Zinermon v. Bosch*, 494 U.S. 113, 125 (1990).

141.    The right of citizens to support themselves by engaging in a chosen lawful occupation or business is deeply rooted in our nation's legal and cultural history and has long been recognized as a component of the liberty and property interests protected by the Fourteenth Amendment. *Truax v. Raich*, 239 U.S. 33, 41 (1915); *Piecknick v. Comm of Pa*., 36 F.3d 1250, 1259 (3d Cir. 1994) (citing *Green v. McElroy*, 360 U.S 474, 492 (1959); *Truax*, 239 U.S. at 41); *Medina v. Rudman*, 545 F.2d 244, 250 (1ˢᵗ Cir. 1976). *See also Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

142.    The Fourteenth Amendment also prohibits government action that arbitrarily infringes the fundamental liberty interest of citizens to travel, be out and about in public, associate, and simply be left alone while otherwise acting in a lawful manner. *City of Chicago v. Morales*, 527 U.S. 41, 53-54 (1999); *Aptheker v. Secretary of State*, 378 U.S. 500, 520 (1964); *Kent v. Dulles*, 357 U.S. 116, 126 (1958) (right to travel includes interstate and intrastate travel) ; *Lutz v. City of York*, 899 F.2d 255, 268 (3d Cir. 1990); *See also Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972).

143.    The substantive due process component of the Fourteenth Amendment forbids the government from infringing upon fundamental liberty interests regardless of the process provided unless the infringement survives review under strict scrutiny. *See, e.g. Memorial Hospital v. Maricopa County*, 415 U.S. 250, 257-258 (1974); *Dunn v. Blumstein*, 405 U.S. 330, 339-341 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 638 (1969), *Maher v. Roe*, 432 U.S. 464, 488 (1977).

144.    The Orders and restrictions at issue in this matter cannot be sustained even under the less-exacting standard that the state action in question must be narrowly tailored to serve a compelling state interest. *Reno v. Flores*, 507 U.S. 292, 301-302 (1993).

145.    The United States Supreme Court has declared that "even in a pandemic, the Constitution cannot be put away and forgotten." See, Roman Catholic Diocese of Brooklyn v. Cuomo, 592 U.S. _____ , 14 S.Ct. 63, 68 (2020)(per curiam).  States and local jurisdictions have interpreted the 115 year old decision in Jacobson v. Massachusetts, 197 U. S. 11 (1905), and its progeny, as a license to violate constitutional rights of individuals and businesses under a state's police powers.  The Jacobson decision involved the mandatory vaccination of an individual against the smallpox disease.

146.    The smallpox disease has been described as "the most dreadful scourge of the human species."[30]  See, www.cdc.gov/smallpox/history/history.html  The smallpox disease killed 3 out of every 10 people infected with the disease.  Many smallpox survivors were left with permanent scars over large areas of their body, especially their faces.  Some were left blind.  We vigorously assert that the current COVID-19 pandemic is not even remotely comparable to the scourge of the smallpox disease, and the Jacobson decision does not shield the Town from liability.

147.    The imposition of partial lockdowns requiring vast segments of the population to remain at home regardless of their status as a carriers of disease is on its face arbitrary and is not narrowly tailored to serve a compelling public interest. Remarkably, despite multiple changes in the Orders, the State Public Health Officer's stay-at-home order of March 19, 2020 remains in effect as of the filing of this Complaint. Such broad-ranging and sweeping measures have never been previously employed to prevent the spread of disease. Mitigation efforts in response to the Spanish Flu pandemic—the most deadly pandemic in American history—did not come close to imposing restrictions comparable to the partial lockdown order and business closures and restrictions imposed and enforced by defendants.  Although this nation has been faced with many epidemics and pandemics, governments have never

---

[30] www.cdc.gov/smallpox/history/history.html

1   responded with lockdowns of entire populations and shutdowns of significant sectors of the

2   economy for extended and indefinite periods.

3       148.    Neither general lockdown of non-essential enterprise lockdown measures,

4   wide-ranging business closures, nor prohibitions on public gatherings can be justified as

5   quarantines. Quarantine orders may be permitted as to infected individuals, but not the public

6   at large. *Robinson v. State of California*, 370 U.S. 660, 666 (1962). "Before exercising their

7   full powers to quarantine, state official must show that 'reasonable ground exists to support the

8   belief" that the person so held is infected. *In re Martin*, 83 Cal.App.2d 164, 167 (1948)

9   (citation and internal quotes omitted). Public health officials must be able to show "probable

10   cause to believe the person so held has an infectious disease . . . ." *Id*. California courts have

11   found that "a mere suspicion [of a contagious disease], unsupported by facts giving rise to

12   reasonable or probable cause, will afford no justification at all for depriving persons of their

13   liberty and subjecting them to virtual imprisonment under a purported order of quarantine." *Ex*

14   *parte Arata*, 52 Cal. App. 380, 383 (1921). The selective lockdown and business closure and

15   public gathering provisions of the Orders at issue apply broadly to persons, businesses, and

16   lawful gatherings without any specific showing of infection or of the probability of

17   transmission.

18       149.    Evidence and analysis available since at least May 2020 further establish that

19   the state actions at issue in this matter—widespread population lockdowns, widespread

20   business closures and restrictions, and pervasive restrictions on the right of the people to

21   travel, associate, and assemble to pursue lawful spiritual, political, economic, and social

22   ends—cannot be justified as rationally necessary to protect public health.

23       150.    At a press conference on March 19, 2020, Defendant Newsom repeatedly said

24   the rationale for the March 19, 2020, Order was to "bend the curve" to slow down

25   transmission of COVID-19 enough to reduce the strain of an expected, large influx of COVID-

26   19 cases was anticipated to produce.[31]  Defendant Newsom predicted a 20 percent

---

[31] March 19, 2020 press briefing available as of October 8, 2020 at:
https://www.youtube.com/watch?v=8OeyeK8-S5o. (See also 3/19/20 EO-N-33-20 and Order
of the State Public Health Officer.)

hospitalization rate and 56 percent infection rate in California.  Had these predictions proven accurate, California would have experienced 25.5 million infections, over 5 million total hospitalizations, nearly 100,000 simultaneous hospitalizations, and a shortfall of 9,336 hospital beds.[32]

151.    While the March 19, 2020 Order was arguably reasonable as a short term measure taken with limited information, epidemiological evidence has long since demonstrated that there is no rational basis for believing that the sweeping restrictions still in place are necessary to achieve the goal of bending the curve or combating COVID-19.

152.    Current hospitalizations, and ICU usage attributable to COVID-19 demonstrate that the bending of the curve in the Spring of 2020 was minor and did not curtail vast increase of infections occurring contemporaneously with typical increases in seasonal cold and flu infections.

153.    Without minimizing the impact of these cases on the infected individuals, their families and the community, these numbers are not even in the general vicinity of the predictions that Defendant Newsom relied upon in issuing the March 19, 2020 Order.

154.    The factual predicates for the March 19, 2020 Order have proven inaccurate by orders of magnitude. California did not use the hospital ship provided by the United States Navy in response to Defendant Newsom's March 4, 2020 letter to President Trump. There has been no shortfall of hospital beds, ICU units, or ventilators. No COVID-19 patient in California has been denied needed medical attention because the health care system was overtaxed.

155.    As early as April 16, 2020, Defendant Newsom himself stated that the goal of bending and arguably flattening the curve had been achieved.[33]

156.    The grossly exaggerated predictions relied on by Defendant Newsom in issuing the Orders and restrictions at issue appear to have been based on extremely high effective rates

---

[32] *Id.*

[33] https://www.rev.com/blog/transcripts/gov-gavin-newsom-california-covid-19-briefing-transcript-april-16

of transmission reported in Wuhan, China, when the virus first emerged.  When the effective rate of transmission falls below a value of 1, an infectious agent is considered not to be spreading.

157.    In addition, a number of studies of antibody tests conducted as early as April 2020 have concluded that the virus has spread through the population far more widely than is indicated by positive test results. While none of these studies is conclusive, they have been consistent in concluding that the virus has spread through the population at rates from ten to fifty times greater than the incidence of infection derived from positive test results. Higher overall rates of transmission means that negative outcomes from COVID-19 -hospitalizations, ICU use and deaths- are far less frequent as a percentage of total infections than indicated by calculating the rate of these outcomes as a percentage of positive test results.

158.    Effective lowering of the transmission and lethality of the virus can be achieved by less restrictive means that are narrowly tailored to the risks presented by COVID-19. Eight in ten deaths from COVID-19 occurred to those age 65 or older, and of those deaths, more than 50% were 85 or older.[34] Those suffering from preexisting conditions such as diabetes, hypertension, and heart disease also face grossly disproportionate risks from COVID-19. Measures to protect vulnerable populations combined with appropriate hygiene measures are sufficient to combat the spread and negative outcomes of COVID-19. This is demonstrated by the COVID-19 outcomes achieved in Taiwan and Sweden without implementing sweeping lockdown measures and business closures and restrictions.

159.    The Orders and wide-ranging restrictions at issue, imposed for extended and indefinite periods, are not only not narrowly tailored to serve the purpose of promoting public health, they are also deleterious to public health and therefore arbitrary and irrational.  A rational response to COVID-19 pandemic must necessarily weigh the expected positive health outcomes of the measures proposed in response to the pandemic against the negative health outcomes associated with such measures. There is no indication that defendants have

---

[34] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. Retrieved October 12, 2020

undertaken this analysis. Given the undisputed negative health outcomes associated with the Orders and restrictions at issue, the failure of defendants to weigh the expected positive health outcomes of the Orders and restrictions at issue against the negative health outcomes of those Orders and restrictions renders the Orders and restrictions at issue arbitrary and irrational in violation of the Due Process Clause of the Fourteenth Amendment.

160.    The irrationality and negative health outcomes associated with the restrictions at issue are demonstrated by the Great Barrington Declaration, a statement authored by three respected epidemiologists: Dr. Martin Kulldorf, professor of Medicine at Harvard, Dr. Sunetra Gupta, professor at Oxford University and Dr. Jay Bhattacharya, professor at Stanford. The Great Barrington Declaration has since been endorsed by 11,097 medical and public health scientists and 30,961 medical practitioners.[35] The Great Barrington Declaration merits quotation in full.

> As infectious disease epidemiologist and public health scientists we have grave concerns about the damaging physical and mental health impact of prevailing COVID-19 policies, and recommend an approach we call Focused Protection.
>
> Coming from both right and left, and around the world, we have devoted our careers to protecting people. Current lockdown policies are producing devastating effects on short and long-term public health. The results (to name a few) include lower childhood vaccination rates, worsening cardiovascular disease outcomes, fewer cancer screenings and deteriorating mental health- leading to greater excess mortality in years to come, with the working class and younger members of society carrying the heaviest burden. Keeping students out of school is a grave injustice.
>
> Keeping these measures in place until a vaccine is available will cause irreparable damage, with the underprivileged disproportionately harmed.
>
> Fortunately, our understanding of the virus is growing. We know that vulnerability to death from COVID-19 is more than a thousand-fold higher in the old and infirm than in the young. Indeed, for children, the threat of COVID-19 is less dangerous than many other harms, including influenza.
>
> As immunity builds in the population, the risk of infection to all -including the vulnerable- falls. We know that all populations will eventually reach herd immunity – i.e. the point at which the rate of new infections is stable – and that this can be assisted by (but is not dependent upon) a vaccine. Our goal should therefore be to minimize mortality and social harm until we reach herd immunity.

---

[35] https://gbdeclaration.org/view-signatures/ Retrieved October 23, 2020.

The most compassionate approach that balances the risks and benefits of reaching herd immunity, is to allow those who are at minimal risk of death to lead their lives normally to build up immunity to the virus through natural infection, while better protecting those who are at highest risk. We call this Focused Protection.

Adopting measures to protect the vulnerable should be the central aim of health responses to COVID-19. By way of example, nursing homes should use staff with acquired immunity and perform PCR testing of other staff and all visitors. Staff rotation should be minimized. Retired people living at home should have groceries and other essentials delivered to their home. When possible, they should meet family members outside rather than inside. A comprehensive list of measures, including approaches to multigenerational households, can be implemented, and is well within the scope and capability of public health professionals.

Those who are not vulnerable should immediately be allowed to resume life as normal. Simple hygiene measures, such has hand-washing and staying home when sick should be practiced by everyone to reduce the herd immunity threshold. Schools and universities should be open for in-person teaching. Extracurricular activities, such as sports, should be resumed. Young, low-risk adults should work normally, rather than from home. Restaurants and businesses should be open. Arts, music, sport and other cultural activities should resume. People who are more at risk may participate if they wish, while society as a whole enjoys the protections conferred on the vulnerable by those who have built up herd immunity.[36]

161.    A policy that promotes one positive outcome–the reduction of the negative effects of COVID-19–without considering the countervailing negative effects of the policy itself is the very definition of arbitrary, particularly when alternative measures are available that would effectively promote all desired outcomes. There is no reason to believe that the negative health outcomes associated with the coercive state actions at issue were considered by defendants in formulating the Orders, restrictions and enforcement measures at issue in this matter.

162.    The September 30, 2020 equity metric incorporated in the August 28, 2020 Order is arbitrary insofar as it requires all counties to submit a plan as a condition to moving to a lower tie, i.e., a lower level of restrictions. The required plan has no bearing on whether the conditions justifying the exercise of emergency power -the spread of COVID-19 and the incidence of the resulting negative health effects- prevail at levels justifying a particular level of restrictions.

---

[36] https://gbdeclaration.org/ (October 23, 2020).

163.     The rapidly evolving use of adjustments, algorithm, undisclosed data sources, delayed updated, and projections based on many speculative factor, such as those used in the purported determination of adult ICU bed availability, is further indication of the arbitrary nature of the measures implemented and enforced by the defendants.  Further, defendants have not shown even minimal evidence that the implemented procedures have had a measurable effect of the spread of the virus over a typical seasonable trajectory of respiratory virus spread during cold and flu season.  Merely choosing desired behaviors to be practiced by the residents of California, particularly those in vocations not deemed essential, and then finding a scheme for mandating of those behaviors is further indication of the arbitrary nature of the schemes being used.

164.     The indefinite duration of the measures at issue is a further indication that the measures are arbitrary.  Defendant Newsom indicated in public remarks in April 2020 that living under emergency orders is the new normal for the next 12-18 months.[37] The stay-at-home Order imposed on March 19, 2020, remains in effect.

165.     The Orders and restrictions at issue arbitrarily and irrationally subject plaintiffs and others in the Town of Mammoth to restrictions that bear no rational relationship to the harm to which the Orders and restrictions are directed.  The ability of the healthcare facilities serving the Town of Mammoth and its environs to deliver needed treatment to those affected by COVID-19 or other health problems been not been adversely affected by cases of COVID-19 at any time. However, defendants have subjected plaintiffs and the Town of Mammoth to the Orders and restrictions at issue by placing it in a large and widely-differentiated geographic area which has, on average, experienced significantly greater adverse effects from COVID-19 when measured by cases, outcomes, and the impact of COVID-19 on the ability to deliver needed healthcare to COVID-19 patients and those with other health problems. While measures implemented by state actors to address problems need not achieve a good or even reasonable fit with those problems under a rational basis review (which plaintiffs do not concede is applicable), such measures must bear at least some rational relationship to the

---

[37] https://www.youtube.com/watch?v=wQW0QGthFV4 Retrieved October 12, 2020.

problem. Here, there is no such rational relationship. Defendants have subjected plaintiffs and others in the Town of Mammoth to restrictions that are entirely useless and serve no purpose whatsoever.

166.    The ever-changing requirements imposed on plaintiffs and other businesses and organizations are a further indication of the arbitrary nature of the measures at issue. Plaintiffs have been prohibited from lodging, had the restriction lifted subject to conditions, only to have lodging essentially banned again. Perpetually changing and ever-expanding restrictions imposed by executive fiat are hallmarks of arbitrary rule.[38]

167.    Claims that the Town of Mammoth Lakes is limiting visitors by imposing tier-based lodging restrictions are irrational because the claims are not supported by any evidence, and is not an effective manner of limiting visitors.  Ski enthusiasts are able to procure lodging in neighboring Inyo County, which is not "striving" to limit visitors under the Purple Tier. Further, visitors are able to merely drive into the Town, park, and walk about, without any limits or prohibitions.  The Town has no evidence that the lodging restrictions place any substantive limit on visitors.  Further, even it there was evidence, the benefit would not offset the substantial harms imposed by the lodging restrictions.

168.    The designation of essential and non-essential businesses, i.e., those allowed to operate, under the Orders and restrictions at issue is also characterized by arbitrary distinctions. While some businesses that have been allowed to operate are clearly critical to human needs during an emergency, other preferred businesses have been allowed to operate notwithstanding the fact that they pose risks equal to or greater than other businesses deemed non-essential. In response to lobbying, the State Defendants amended the list of "essential" businesses to include cannabis retailers. At the same time, plaintiffs have been subjected to regulations imposed by the County Defendants and the Town Defendants that all but preclude single household lodging during the Regional Stay-at-Home Order, and substantially limits it under the current Orders and regulations.

---

[38] Executive Order N-64-20, May 8, 2020

169.   The designation of essential and non-essential businesses also arbitrarily places the burden of stopping the spread of COVID-19 on a limited class of persons and businesses. By way of example, entertainment venues, tourist destinations, restaurants and wineries have been and continue to be either shutdown or severely circumscribed in their operations. Businesses providing personal services—such as barbers, cosmetologists, nail salons and gyms have been similarly restricted in their operations and completely shut down at times. Meanwhile certain segments of the economy—such as large discount and hardware retailers— have remained in operation continuously and have even experienced increases in revenues and profits.

170.   Under the legal authority under which they purport to act, defendants are able to reinstate any previously imposed Orders and restrictions if preliminary and permanent injunctive relief is not granted.

171.   Plaintiffs have been damaged by the unconstitutional Orders and restrictions imposed and enforced by defendants.

172.   Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected liberty and property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

173.   Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restrictions imposed by defendants.

## SECOND CAUSE OF ACTION

### (42 U.S.C. § 1983-Fourteenth Amendment Procedural Due Process)

174.   Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

175.   Procedural protections must be afforded when the government acts to deprive individuals of protected liberty or property interests. *Matthews v. Eldridge*, 424 U.S. 319, 322 (1976). Procedural due process does not forbid the government from depriving individuals of a protected interest, but rather requires the government to employ adequate procedures that

ensure the fairness of any deprivation. *See McNabb v. United States*, 318 U.S. 332, 347 (1943). The "involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law." O'*Connor v. Donaldson*, 422 U.S. 563, 580 (1975).

176.     Defendants have deprived plaintiffs of their protected liberty and property interests without providing notice and an opportunity to be heard.  Defendants have imposed Orders and restrictions with the force of law through the exercise of executive power without providing an opportunity for plaintiffs and other members of the public to contest or challenge the resulting limitations on their fundamental rights.  The Orders and restrictions have been in place in one form or another for over seven months and remain in effect for an indefinite period into the future.

177.     Finance Defendants have issued citations without any description of the purported violation(s), and require deposit of onerous fines or immediate hardship waiver approval to obtain an administrative review.  Further, Finance Defendants have imposed extremely punitive late payment penalties for failure to pay the onerous fine within an extremely short time period of a few days.  "Also, the enforcement of "apparent" violations and the subjective standard of "satisfactory evidence" each render MLMC section 5.04.340 as vague.  In addition, administrative citations and imposition of fines are not authorized by the subject municipal code section.  Imposing fines, or threatening to impose fines, for apparent violations without evidence, and without informing of the conduct giving rise to the apparent violations, also violates Plaintiffs procedural due process rights.  All of the Town Defendants bear responsibility for these enforcement actions.

178.     Under the legal authority under which they purport to act, defendants are able to reinstate any previously imposed Orders and restrictions if preliminary and permanent injunctive relief is not granted.

179.     Plaintiffs have been damaged by the unconstitutional Orders and restrictions imposed and enforced by defendants.

180.     Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected liberty and property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

181.     Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restrictions imposed by defendants.

### **THIRD CAUSE OF ACTION**

### **(42 U.S.C. § 1983-Fourteenth Amendment Equal Protection)**

182.     Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

183.     The Fourteenth Amendment to the United States Constitution requires states to govern impartially. Classifications that subject similarly situated persons or classes of persons to differing treatment violate the equal protection guarantee of the Fourteenth Amendment.

184.     Strict scrutiny applies to classifications that impinge on fundamental rights. *San Antonio Ind. School Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).

185.     The Orders and restrictions imposed by defendants impinge on the fundamental rights of plaintiffs and the people of the State of California to freedom from confinement and to travel, associate, engage in business and trade, seek gainful employment and generally be left alone to engage in otherwise lawful pursuits.

186.     The Orders and restrictions at issue violate plaintiffs' right to due process by subjecting plaintiffs to arbitrary and irrational classifications.  COVID-19 has affected few individuals in the Town of Mammoth. The ability of the healthcare facilities serving the Town of Mammoth and its environs to deliver needed treatment to those affected by COVID-19 or other health problems been not been adversely affected by cases of COVID-19 at any time. However, defendants have subjected plaintiffs and the Town of Mammoth to the Orders and restrictions at issue by placing it in a large and widely-differentiated geographic area which has, on average, experienced significantly greater adverse effects from COVID-19 than the Town of Mammoth when measured by cases, outcomes, and the impact of COVID-19 on the

ability to deliver needed healthcare to COVID-19 patients and those with other health problems. While classifications need not be precise or even reasonable under rational basis review (which plaintiffs do not concede is applicable), classifications must be based on rational criteria. However, there is no rational statistical basis for the classification of the Town of Monmouth based on statistics for the massive Southern California region.

187.    The Orders and restrictions imposed by defendants are based on arbitrary classifications and criteria that are not rationally related to promoting public health, that promote the interests of favored groups without reference to the impact of the activities in question on the transmission of COVID-19 and that shift the burden of the response to COVID-19 to a limited class of persons and businesses.

188.    The right to equal protection guaranteed by the Fourteenth Amendment is also violated by enforcement measures that intentionally, and without rational basis, treat persons or groups differently from others similarly situated. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008). The County Defendants have violated plaintiffs' right to equal protection by intentionally enforcing health regulations and the Orders and restrictions at issue differently against defendants from similarly situated lodging entities.

189.    Under the legal authority under which they purport to act, defendants are able to reinstate any previously imposed Orders and restrictions if preliminary and permanent injunctive relief is not granted.

190.    Plaintiffs have been damaged by the Orders and restrictions imposed and enforced by defendants.

191.    Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected liberty and property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

192.    Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restrictions imposed by defendants.

## **FOURTH CAUSE OF ACTION**

### **(42 U.S.C. § 1983-Fifth Amendment)**

193.    Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

194.    The Takings Clause of the Fifth Amendment of the U.S. Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V.

195.    The Fifth Amendment's Takings Clause "was designed to bar Government from forcing people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

196.    Defendants' imposition and enforcement of Orders restricting the operation of plaintiffs' businesses for an indefinite period and having no stated end date has caused both a regulatory and physical taking of plaintiffs' property without just compensation. At a minimum, defendants' Orders and restrictions have effected a partial taking. *See Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978). Defendants' unprecedented and highly disruptive Orders and restrictions have significantly reduced plaintiffs' revenues, profits and income, resulting in significant uncompensated harm to plaintiffs' distinct, investment-backed expectations in their businesses.  If defendants' unconstitutional Orders and restrictions are not preliminarily and permanently enjoined, plaintiffs are threatened with the imminent total loss of their protected property interests in their investments, revenues, profits, income and the value of their businesses.

197.    Under the legal authority under which they purport to act, defendants are able to reinstate any previously imposed Orders and restrictions if preliminary and permanent injunctive relief is not granted.

198.    Plaintiffs have been damaged by the unconstitutional Orders and restrictions imposed and enforced by defendants.

199.    Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

200.    Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restriction imposed by defendants.

## FIFTH CAUSE OF ACTION

### (42 U.S.C. § 1983-Commerce Clause)

201.    Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

202.    The Commerce Clause of the United States Constitution provides that the United States Congress shall have the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, Section 8, Clause 3.

203.    The Commerce Clause prohibits states from exercising sovereign authority that excessively burdens interstate commerce. "[T]he incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack. Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause." *Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 670 (1981).

204.    Plaintiffs and Coalition members engage in substantial interstate commerce and engage in activities that have a substantial effect on interstate commerce. These plaintiffs purchase goods and services in interstate commerce and serve travelers who visit California from other states and foreign countries.

205.    Residents and businesses in the State of California engage in billions, if not trillions, of dollars of interstate commerce through employment, the purchase and sale of

goods and services, and by serving thousands, if not millions, of travelers who visit California annually from other states and foreign countries.

206.    The Orders and restrictions imposed and enforced by defendants excessively burden interstate commerce by precluding plaintiffs and the people of California from engaging in substantial and wide-ranging economic, business and employment activities.

207.    Under the legal authority under which they purport to act, defendants are able to reinstate any previously imposed Orders and restrictions if preliminary and permanent injunctive relief is not granted.

208.    Plaintiffs have been damaged by the unconstitutional Orders and restrictions imposed and enforced by defendants.

209.    Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected liberty and property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

210.    Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restrictions imposed by defendants.

## **PRAYER**

Plaintiff prays for an Order awarding the following relief against the State Defendants:

A.    Preliminary and permanent injunctive relief precluding the enforcement of the following Orders:

1.    Governor Newsom's March 4, 2020 Emergency Order;

2.    Governor Newsom's March 19, 2020 Emergency Order;

3.    Governor Newsom's May 4, 2020 Emergency Order;

4.    The State Public Health Officer's March 19, 2020 Order;

5.    The State Public Health Officer's August 28, 2020 Order;

6.    Governor Newsom's December 5, 2020 Emergency Order.

B.    A judicial declaration that the following Orders violate plaintiffs' rights under the Fourteenth and Fifth Amendments to the United State Constitution:

1             1.       Governor Newsom's March 4, 2020 Emergency Order;

2             2.       Governor Newsom's March 19, 2020 Emergency Order;

3             3.       Governor Newsom's May 4, 2020 Emergency Order;

4             4.       The State Public Health Officer's March 19, 2020 Order;

5             5.       The State Public Health Officer's August 28, 2020 Order;

6             6.       Governor Newsom's December 5, 2020 Emergency Order.

7     C.       Attorney's fee and costs;

8     D.       All such other relief the court deems just and proper.

9       Plaintiff prays for an Order awarding the following relief against the County

10 Defendants:

11     A.       Preliminary and permanent injunctive relief precluding the enforcement of the

12 following Orders:

13             1.       Governor Newsom's March 4, 2020 Emergency Order;

14             2.       Governor Newsom's March 19, 2020 Emergency Order;

15             3.       Governor Newsom's May 4, 2020 Emergency Order;

16             4.       Governor Newsom's December 5, 2020 Emergency Order.

17             5.       The State Public Heath Officer's March 19, 2020 Order;

18             6.       The State Public Heath Officer's August 28, 2020 Order;

19             7.       The Mono County Public Health Officer's March 17, 2020 Order;

20             8.       The Mono County Public Health Officer's December 5, 2020 Order;

21             9.       The Mono County Public Health Officer's January 9, 2021 Order;

22             10.      The Mono County Public Health Officer's January 25, 2021 regulations.

23     B.       A judicial declaration that the following Orders violate plaintiffs' rights under

24 the Fourteenth and Fifth Amendments to the United State Constitution:

25             1.       Governor Newsom's March 4, 2020 Emergency Order;

26             2.       Governor Newsom's March 19, 2020 Emergency Order;

27             3.       Governor Newsom's May 4, 2020 Emergency Order;

28             4.       Governor Newsom's December 5, 2020 Emergency Order.

1         5.     The State Public Health Officer's March 19, 2020 Order;

2         6.     The State Public Health Officer's August 28, 2020 Order;

3         7.     The Mono County Public Health Officer's March 17, 2020 Order;

4         8.     The Mono County Public Health Officer's December 5, 2020 Order;

5         9.     The Mono County Public Health Officer's January 9, 2021 Order;

6         10.     The Mono County Public Health Officer's January 25, 2021 regulations.

7    C.     Compensatory damages in the amount $500,000 or such other amount proven at

8    trial;

9    D.     Attorney's fee and costs;

10   E.     All such other relief the court deems just and proper.

11

12   Plaintiff prays for an Order awarding the following relief against the Town

13   Defendants:

14   A.     Preliminary and permanent injunctive relief precluding the enforcement of the

15   following Orders:

16        1.     Governor Newsom's March 4, 2020 Emergency Order;

17        2.     Governor Newsom's March 19, 2020 Emergency Order;

18        3.     Governor Newsom's May 4, 2020 Emergency Order;

19        4.     Governor Newsom's December 5, 2020 Emergency Order.

20        5.     The State Public Heath Officer's March 19, 2020 Order;

21        6.     The State Public Heath Officer's August 28, 2020 Order;

22        7.     The Mono County Public Health Officer's March 17, 2020 Order;

23        8.     The Mono County Public Health Officer's December 5, 2020 Order;

24        9.     The Mono County Public Health Officer's January 9, 2021 Order;

25        10.     The Mono County Public Health Officer's January 25, 2021 regulations.

26        11.     The Town Defendants' Ordinance No. 20-05.

27        12.     The Town Defendant's Updated Processes of January 27, 2021.

28

1     B.      A judicial declaration that the following Orders violate plaintiffs' rights under
2 the Fourteenth and Fifth Amendments to the United State Constitution:
3              1.      Governor Newsom's March 4, 2020 Emergency Order;
4              2.      Governor Newsom's March 19, 2020 Emergency Order;
5              3.      Governor Newsom's May 4, 2020 Emergency Order;
6              4.      Governor Newsom's December 5, 2020 Emergency Order.
7              5.      The State Public Health Officer's March 19, 2020 Order;
8              6.      The State Public Health Officer's August 28, 2020 Order;
9              7.      The Mono County Public Health Officer's March 17, 2020 Order;
10             8.      The Mono County Public Health Officer's December 5, 2020 Order;
11             9.      The Mono County Public Health Officer's January 9, 2021 Order;
12             10.     The Mono County Public Health Officer's January 25, 2021 regulations.
13             11.     The Town Defendants' Ordinance No. 20-05.
14             12.     The Town Defendant's Updated Processes of January 27, 2021.
15     C.      Compensatory damages in the amount $500,000 or such other amount proven at
16 trial;
17     D.      Attorney's fee and costs;
18     E.      All such other relief the court deems just and proper.
19                              **JURY DEMAND**
20     Plaintiffs demand trial by jury.
21
22 Date: February 1, 2021                      BAILEY AND ROMERO
23
24                                             _____
25                                             Steven C. Bailey, Attorney for Plaintiffs Cindy and
                                               Timothy Abshire, Alan and Monica Butts, Nomadness
26                                             Corporation, and The Mammoth Lakes Business
                                               Coalition
27
28